GIMBEL BROTHERS, INC., et al.

v.

The UNITED STATES.

Nos. 433–61, 360–62.

United States Court of Claims.

Dec. 13, 1968.

Lyman G. Friedman, Washington, D. C., for plaintiffs, Robert A. Schulman, Washington, D. C., attorney of record.

Philip R. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant, Michael I. Sanders, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule

57(a). The commissioner has done so in an opinion and report filed on November 30, 1967. Exceptions to the commissioner's opinion, findings and recommendation for conclusion of law were filed by plaintiffs and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, insofar as plaintiffs' petitions assert claims based upon plaintiffs' right to use the LIFO method of inventory valuation for their fiscal years 1943, 1944, 1945 and 1946, the petitions are dismissed.

## OPINION OF COMMISSIONER

GAMER, Commissioner:

In these consolidated proceedings, plaintiffs seek to recover over $4,635,700 as alleged overpayments of income, declared value excess profits, and excess profits taxes, for their taxable years ended January 31, 1943, 1944, 1945, and 1946, plus interest thereon.

The primary issue is plaintiffs' right to compute the value of their inventories during such years on the last-in, first-out (LIFO) basis provided in Section 22(d) (1) (B) of the Internal Revenue Code of 1939, as amended. 26 U.S.C. § 22(d) (1) (B) (1946).[1]

Under Section 22(d) (2) (A) an "application to use such method" was required to be "filed at such time and in such manner as the Commissioner [of Internal Revenue] may prescribe."

In early 1942, plaintiffs were ineligible to use LIFO and had not filed any application to use the method. Section 22

(d) (2) (B) of the 1939 Code and the regulations issued thereunder (Treasury Regulations 101, as amended by T.D. 4959 (1940–1 Cum.Bull. 22), approved December 28, 1939) then prevented taxpayers from using LIFO if they had used, in reporting to shareholders (among others) or for credit purposes, any procedure other than LIFO for any period during the first taxable year for which, pursuant to their applications, the LIFO method was to be used. Plaintiffs had, following their consistent practice, issued an interim report to their stockholders for the period February 1, 1941, to July 31, 1941, which had been prepared on the first-in, first-out (FIFO) method of inventory valuation. Plaintiffs had theretofore always used such FIFO method.

However, legislation was at that time under consideration by the Congress which was designed to remove the prohibition against the adoption of LIFO for a year during which an interim report on a non-LIFO basis had been issued. All that was proposed to be required was that the annual report be made on a LIFO basis. As of April 9, 1942, plaintiffs' Annual Report for the year ended January 31, 1942, had not as yet been issued. In anticipation of the passage of such amendatory legislation, the Board of Directors of Gimbel Brothers, Inc., at a special meeting held on such date, decided that it would be in the company's best interests henceforth to adopt the LIFO method in preparing its financial statements, and that the company's Annual Report to its stockholders for the year ended January 31, 1942, should, in order to make the company eligible for the use of such method on its tax returns commencing with such year when and if the legislation was pass-

1. Gimbel Brothers, Inc. (plaintiff No. 1 in both petitions), a New York corporation operating a nationwide network of department and specialty stores, is the common parent of an affiliated group of corporations which filed consolidated tax returns under Section 141 of the Code. Therefore, all the members of the group are parties plaintiff. However, plaintiffs Gimbels, Saks & Company, and Kaufmann and Baer Company, were the only members of the group (the "merchandising members") for which inventories were an income-determining factor. Accordingly, the term "plaintiffs" will, unless otherwise specifically designated, be used herein as referring only to such three members of the group.

ed, be issued on such basis. On April 11, 1942, such report for fiscal 1942 was issued with inventories valued by LIFO, the report noting that there was "reason to believe" retroactive legislation would make this permissible for tax purposes. However, when, on July 13, 1942, plaintiffs filed their returns for such fiscal year, no such legislation had as yet been passed, and such returns were filed on the FIFO method of inventory valuation.

The amendatory legislation was, however, passed as part of the Revenue Act of 1942, approved October 21, 1942 (56 Stat. 798). Section 118 of the Act removed the prohibition against the adoption of LIFO for a year during which an interim report had been issued on a non-LIFO basis, such change being made retroactive to taxable years commencing after December 31, 1938. Although the Act still required that annual reports be made on the LIFO basis, plaintiffs were nevertheless eligible to apply LIFO commencing with fiscal 1942 because, as stated, in anticipation of the passage of such retroactive legislation, they had issued their annual report on such basis.

Following the approval of the Act, the then applicable regulations (Treasury Regulations 103) were amended by T.D. 5199, 1942–2 Cum.Bull. 81, approved December 10, 1942. As amended, the pertinent regulation (Treasury Regulations 103, Section 19.22(d)–3), headed "Time and Manner of Making Election," provided that a taxpayer could adopt and use the "elective inventory method" (i. e., LIFO) only if he filed with his return for the taxable year as of the close of which the method was first to be used a statement on a form designated as "Form 970 (Revised)" of "his election to use such inventory method," or if such return was filed prior to March 10, 1943 (as plaintiffs' were), then such Form 970 would similarly, if they wished to employ LIFO commencing with fiscal 1942, have to be filed "prior to such date" of March 10, 1943. Later that month, plaintiffs' responsible officials again considered the problem of using LIFO inventories with respect to the tax returns for fiscal 1942 which had already been filed in July 1942, and reaffirmed their previous decision to adopt such method commencing with such fiscal year. Accordingly, their accountants were instructed to prepare and file the necessary statements of election (i. e., the Forms 970) to use such inventory method commencing with such year, as well as refund claims for such year, since such use of LIFO for that year would produce lower profits and taxes. On March 31, 1943, such statements of election and refund claims were filed.

Plaintiffs had so decided in 1942 to evaluate their inventories on the basis of LIFO in their Annual Report to stockholders, and in 1943 to file LIFO statements of election under the Internal Revenue Code, despite the fact that all during this period the Bureau of Internal Revenue was taking the position that, for tax purposes, retailers such as plaintiffs were not entitled to use the method. The Bureau felt that, since Section 22(d) (1) of the Code referred to the LIFO method of "inventorying goods specified in the application," such method was available only to taxpayers who applied it to the cost of specific inventory items or goods and not to those taxpayers such as plaintiffs (and other retailers) who evaluated their inventories, as was customary under the so-called "retail method," by taking and recording the inventory by department dollar totals at retail and at cost, and not by specific items. Apparently plaintiffs had hoped that the Revenue Act of 1942 would expressly reverse the Bureau's position on this matter, but the Act failed to do so.

Shortly after the filing on March 31, 1943, of their LIFO statements of election, i. e., on April 20, 1943, the Board of Directors of Gimbels met to consider the proposed Annual Report to be issued to the stockholders for the fiscal year ended January 31, 1943, which the auditors had prepared on the LIFO basis (as they had the 1942 report). However, at the meeting the auditors reported that the Bureau was still adamant that taxpayers employing the retail method of recording in-

ventories could not elect to use LIFO for tax purposes. They then pointed out the disadvantages of keeping books on a LIFO basis but filing tax returns on a FIFO basis, as required by the Bureau, with each basis producing different profit results, and reported that many department stores were, for these reasons, reverting to FIFO. The Board then decided to abandon LIFO and to revert to FIFO. The other plaintiffs also so concluded. Further, plaintiffs decided to withdraw their statements of LIFO election filed just three weeks earlier (and upon which no action had as yet been taken), as well as their refund claims with respect to fiscal 1942.

Thereupon, plaintiffs' Annual Report for fiscal 1943 was, on April 24, 1943, issued on the basis of FIFO, the stockholders being advised that the legislation enacted subsequent to the issuance of the 1942 report "was only part of that contemplated at the time the report was issued," and that "it has been determined, therefore, to abandon the 'last-in first-out' method of inventories and to return to the method formerly in use, and to adjust the figures for the year ended January 31, 1942 accordingly." In addition, on April 26 and 28, 1943, plaintiffs sent letters to the Bureau advising that they "desired to withdraw" the refund claims and their "applications for change in inventory method."

Thereafter plaintiffs' Annual Reports and tax returns for fiscal 1943, 1944, 1945 and 1946, the years herein involved (as well as for 1947), were all issued and computed on the basis of FIFO.

However, in 1947 the Tax Court, in Hutzler Brothers Co., 8 T.C. 14, decided that the petitioner, a department store which had also filed a statement of election to use LIFO beginning with its fiscal year ended January 31, 1942, and had so computed its tax for such year, was not, simply because it recorded its inventory under the retail method by department dollar totals at retail and at cost, and not by specific items, precluded from using LIFO under Section 22(d) of the Code.

In February 1948, the Board of Directors of Gimbels decided that, since the Treasury Department had apparently acquiesced in the Hutzler decision, thus entitling Hutzler to compute its taxes on LIFO for 1942 and thereafter, plaintiffs too would, in their forthcoming annual reports, restate their earnings for the preceding fiscal years 1942–1947 on a LIFO basis and, relying on their previously filed statements of election and refund claims for fiscal 1942, would seek further refunds for the fiscal years ended 1943–1947. On March 9, 1948, the Treasury Department issued regulations (T.D. 5605, 1948–1 Cum.Bull. 16) adopting the principles enunciated in Hutzler, thereby definitely indicating acquiescence, and in April 1948, Gimbels' Board decided to issue the fiscal 1948 Annual Report on the LIFO basis, with earnings for 1942–1947 restated on such basis, and also thereafter to file plaintiffs' tax returns on such basis. In December 1948, plaintiffs filed refund claims for the taxable years 1943–1947 based on their LIFO elections beginning with their fiscal year ended January 31, 1942, thereby fixing the cost of their inventories (the "base value") as of February 1, 1941.

However, in 1953, plaintiffs' claims for refund with respect to fiscal 1942 were disallowed because their Form 970 statements of election were not filed until March 31, 1943, which was beyond the March 10, 1943, deadline specified by the above-mentioned regulation, and, further, because such statements in any event had been withdrawn by plaintiffs' above-referred-to letters of April 26 and 28, 1943, and in Kaufmann and Baer Company and Gimbel Brothers, Inc. v. United States, 133 Ct.Cl. 510, 137 F.Supp. 725, cert. denied, 352 U.S. 835, 77 S.Ct. 54, 1 L.Ed.2d 54 (1956), such denial was upheld on the ground of plaintiffs' failure to file a timely election to change to LIFO, the validity of the regulation

fixing March 10, 1943 as the deadline being sustained.[2]

Thereafter, plaintiffs' refund claims with respect to their fiscal years 1943–1946 were, in 1959 and 1960, also disallowed, and these suits followed.[3]

Plaintiffs here contend that even though their statements of election were untimely filed as to fiscal 1942, such statements should nevertheless be deemed to constitute timely filed statements with respect to the subsequent years herein involved. On the basis thereof, and allegedly having met all the other necessary requirements, plaintiffs contend, therefore, that they are entitled to have their taxes for such subsequent years computed on the LIFO basis.

For the following reasons, it is concluded that the disallowance of plaintiffs' fiscal 1943–1946 refund claims was proper:

1. For none of such years did plaintiffs file the statements of election (Form 970) required by the above-mentioned provisions of the Code and the regulations. As shown, the pertinent regulation specifically provided that LIFO "may be adopted and used *only* if the taxpayer *files with his return for the taxable year as of the close of which the method is first to be used * * * * a statement of his election to use such inventory method." (Italics supplied.) The taxable year "as of the close of which the method is first" proposed "to be used" by plaintiffs, as here now contended for, is their fiscal year ended January 31, 1943. But the only Form 970 they ever filed was one which sought to have fiscal 1942 as such first year.

Thus, although plaintiffs now contend they should be permitted to use LIFO beginning with their taxable year ended January 31, 1943, they did not, as required, file "with" their tax return for such year, or indeed with any of the returns for the other three years herein involved, any election to use the LIFO method of inventory valuation. Indeed, their tax return (and annual stockholders' report) for fiscal 1943 utilized the FIFO method (as did the returns and reports for the other three years). Thus, there is a plain failure on plaintiffs' part to meet the initial, basic filing requirement for the adoption of LIFO and its use for all the years here involved.

Plaintiffs argue, however, that the Forms 970 which they did file electing to change to LIFO commencing with fiscal 1942 constituted a valid statement of election to use LIFO not only for fiscal 1942 but also for all future years, and that, if they did not serve as effective elections to commence such use for fiscal 1942, then they nevertheless automatically constituted elections to commence with the next following year, i. e., 1943. Plaintiffs rely on the wording of the Forms 970 they filed in support of their contention that two separate matters were covered by such filing, i. e., (1) an election (irrevocable, they contend) thenceforth to adopt and use LIFO, and (2) a proposal to have the method first applied commencing with their taxable year ended January 31, 1942. The Form 970 wording relied on is that the taxpayer "hereby makes application to adopt and use the elective inventory method * * * *and* to have such method first applied as of the close of the taxpayer's taxable year ending ――― * * *." (Italics suplied.) Emphasis is placed on the word "and," used, it is claimed, in the disjunctive sense. Even though the second part of the election to commence LIFO with fiscal 1942 could not be effected, they were still entitled, and indeed

---

2. Actually, only Kaufmann and Baer's case was litigated, but the facts in the similar suits filed by Gimbel Brothers, Inc., and Saks & Company were identical. It was stipulated that the evidence in *Kaufmann and Baer* was equally applicable to the other two and, following the ultimate disposition of *Kaufmann*

*and Baer*, and on the basis thereof, they dismissed their suits.

3. Defendant's motion for summary judgment was, on November 16, 1964, denied without prejudice. Its motion for reconsideration was denied on January 22, 1965.

obliged, they say, to use LIFO for the subsequent years in accordance with the first part of the statement, which in effect constituted (quite early, they admit) a valid election to commence with the first eligible year thereafter, in this case 1943, since it turned out that the election was untimely as to the 1942 year specified.

These contentions must be rejected. They would again result in the circumvention of the specific requirement of the regulation that LIFO may be adopted and used only if the return for the first taxable year to which the method is to be applied is accompanied by the election statement. Although plaintiffs now claim fiscal 1943 as such "first taxable year," it is nevertheless conceded that no such election statement was filed "with" the tax return for such year. The statement of election filed on March 31, 1943, untimely designating fiscal 1942 as the beginning LIFO year, cannot serve to fill the void created by the lack of any statement having been filed "with" the 1943 return or designating 1943 as such "first taxable year."

The specification of the first year for the employment of the LIFO method is not a meaningless technicality. It goes to the very heart of the election, for it establishes the date of the base value of the inventory (the "base stock") which, under the last-in, first-out fiction, carries through to all subsequent years.[4] An election to commence LIFO with fiscal 1942 would use as the base value the cost of the inventory as of the beginning of that year, i. e., February 1, 1941, whereas an election to commence with fiscal 1943 would use as such base value the cost as of a year later, which, during an inflationary period, might well be substantially higher. Indeed, the basic purpose that LIFO is intended to serve is to eliminate the element of inflation from inventory values. A taxpayer might well wish to commence his LIFO inventory valuations with 1942, but not with 1943, after an amount of inflation has already crept into his inventory, with his base value thus being pegged at a higher level. For, while LIFO will produce lower profits during an inflationary period (due to lower inventory values), it will result in higher profits during a deflationary period (since the base value of the inventory may be pegged at a higher level than the "lower of cost or market," a method of valuation usable only with FIFO). Thus, and especially during a war period such as was 1942–1943, a LIFO elector in effect gambles on the inflation-deflation situation (there was a precipitous, and in some cases ruinous, price and inventory decline at the end of World War I), and the time of the taxpayer's entry into the cycle is all-important. In passing on the taxpayer's application, the Bureau could not possibly assume that a taxpayer electing LIFO to commence with one year would, if it turned out he was not eligible for such year, want to commence with another year, nor is it at all certain that plaintiffs, had they been confronted with the choice at that time, would have chosen to enter the cycle in 1943. Indeed, under plaintiffs' theory, they would be obliged to apply LIFO in their first taxable year subsequent to 1942 which otherwise qualified under the statute and regulations even though they presumably would not have chosen to initiate LIFO at the price levels prevailing in such subsequent year. This doctrine could be disastrous for a taxpayer. Of course, with the benefit of hindsight, plaintiffs now choose to enter as of 1943, but the very essence of the election is to make a choice for the future, and not for the past.

Not only is the designation of the "first year" all important from the taxpayer's point of view, it is also of major significance insofar as the Bureau's approval of the application is concerned. The data required to be furnished on the

4. Unless the base stock should become depleted, in which case the involuntary liquidation and replacement provisions of Section 22(d) (6) (A) (B) and (C) of the Code (added by the Revenue Act of 1942) come into play.

election Form 970 included an analysis of inventories as of the beginning and end of the specified taxable year for which LIFO was first proposed to be used, as well as of the beginning of the prior taxable year. Thus, plaintiffs' analysis on the untimely application form they did file set forth the inventory values for the fiscal year ended January 31, 1942, its then proposed "first year," on both the LIFO and FIFO bases, and for the two prior taxable years, on only the FIFO basis. No inventory figures on LIFO and FIFO bases were, naturally, submitted with respect to fiscal 1943, the "first year" now claimed, but which figures would, however, have been required had such year been contemporaneously proposed as the "first year." These analyses were required by Form 970 to aid the Bureau to determine, as the form indicated, whether any adjustments in the inventories of prior taxable years would be necessary "in order that the true income of the taxpayer will be clearly reflected." This requirement was pursuant to Section 22(d) (3) of the 1939 Code which provided that "[t]he change to, and the use of, [the LIFO] method shall be in accordance with such regulations as the Commissioner * * * may prescribe as necessary in order that the use of such method may clearly reflect income." Section 22(d) (4) further provided that "[i]n determining income for the taxable year preceding the taxable year for which such method [LIFO] is first used, the closing inventory of such preceding year * * * shall be at cost." [5] This "clear reflection of income" problem is of vital importance in the Commissioner's approval consideration of the LIFO application. See John Wanamaker Philadelphia, Inc. v. United States, 175 Ct.Cl. 169, 359 F.2d 437 (1966). Different figures for different years might well, of course, affect the Commissioner's approval determination, or the conditions therefor.

Plainly, a valid designation of the "first year" for which the elective inventory method (LIFO) is proposed to be used is so integral a part of the election itself that it cannot be considered separate and apart from it. The attempted LIFO application beginning with the fiscal year ended January 31, 1942, and based upon inventory values as of February 1, 1941, having failed because of untimeliness, plaintiffs should, if they then wanted to apply for the adoption and use of the elective inventory method to commence with fiscal 1943, have filed a Form 970 "with" their 1943 return designating 1943 as the "first year" and furnished all of the pertinent data concerning the 1943 and prior years' inventories which the form required. That plaintiffs did not then realize that their application was untimely does not serve to excuse their own negligence and fault.

The conclusion herein arrived at is in accord with R. H. Macy & Co., et al. v. United States, 202 F.Supp. 206 (S.D. N.Y.1961), aff'd per curiam, 311 F.2d 575 (2d Cir. 1963), where the court, after also having first rejected, in R. H. Macy & Co., et al. v. United States, 255 F.2d 884 (2d Cir.), cert. denied, 358 U.S. 880, 79 S.Ct. 119, 3 L.Ed.2d 110 (1958), the taxpayers' refund claims for fiscal 1942, their claimed first LIFO year, for lack of a timely filing of a Form 970 with respect to such year, similarly rejected their claims for refund for the years 1943–1947, no election Form 970 having been filed for any of such subsequent years. Indeed, in affirming *per curiam* the dismissal of the taxpayers' 1943–1947 claims solely on the authority of

---

5. For tax purposes, the value of a LIFO inventory cannot be reduced below its cost (Sections 22(d) (1) (A), 22(d) (4)) whereas a FIFO inventory is based on the lower of cost or market. Thus, during a period of declining market prices, a LIFO inventory may be valued higher than market or replacement cost. Under Section 22(d) (4), a taxpayer who previously used the lower of cost or market method would thus be required, if any valuation had been based on lower market, to increase his ending inventory for the prior year to cost. This would result, of course, in his being required to pay an additional tax on the previous write-down of his inventory to the lower market level.

the first *Macy* case dismissing the 1942 claim, the Second Circuit must have necessarily held, contrary to the "divisibility" theory here urged, that the lack of a timely filing with respect to 1942 left the taxpayers without any valid outstanding LIFO election at all, either with respect to 1943 or any of the other subsequent years.

Missouri Public Service Company v. United States, 370 F.2d 971 (8th Cir. 1967), upon which plaintiffs strongly rely in support of their contention that elections, though "premature," are nevertheless binding and applicable to subsequent years, is inapposite. Not only are different Code sections, a different type of election, and entirely different considerations involved, but under the pertinent regulations the election which was the subject of the controversy could "be adopted without permission and no formal election is required." Missouri Public Service Company, supra, 370 F.2d at 973. Furthermore, an analysis of the case shows that it is in fact far from helpful to plaintiffs. The court held that an election made by the taxpayer concerning a method of depreciation was in fact not premature simply because the depreciation deductions could not commence on the particular property involved until the following year, when it was actually put into use. The taxpayer (unlike plaintiffs) had, during the subsequent years, in fact applied the elected method, but later (like plaintiffs) attempted to reverse the situation for all such years, claiming its original "premature" election to have been invalid (because the method could not be applied to the year of election). The court rejected the attempt, holding that, even if the original election be deemed to have been "premature" (although the court did not so consider it), the taxpayer's continuing use of the originally selected method nevertheless constituted new elections. It described such attempt as resulting from "belated hindsight" (at 975), a characterization peculiarly applicable to plaintiffs' attempt herein.[6]

■ 2. In any event, whether or not plaintiffs' statements of election (Form 970) be properly construed, as plaintiffs contend, as "divisible" and therefore applicable to 1943 as the "first year," even though not designated as such, it is plain that such statements were nevertheless effectively withdrawn. Thus, plaintiffs cannot stand on such elections at all and, as shown, there are no others.

Such withdrawals were effected by plaintiffs' letters of April 26 and 28, 1943, to the appropriate Collectors of Internal Revenue stating that "we desire to withdraw" the "applications for change in inventory method" and the refund claims filed therewith, as well as by a second letter of May 5, 1943, from Kaufmann and Baer to the Commissioner of Internal Revenue stating that "we desire to withdraw this claim for refund and also to withdraw, or cancel, our application for a change in our inventory method."

---

6. I.T. 3456, 1941–1 Cum.Bull. 201, does not hold, as plaintiffs contend, that "two divisible things" were involved in a Form 970 LIFO election, i. e., (1) the election to use LIFO, and (2) the selection, as "a separate matter," of the first year to which the method was to be applied. (Plaintiffs' Brief to the Commissioner, pp. 54–55.) All that was there held was that where, on a LIFO application, a correct reflection of income required an adjustment for a prior year for which additional taxes were barred by the statute of limitations, and the taxpayer refuses to waive the statutory bar, "approval of the change to the elective method may be withheld and not granted except for a subsequent year." (I.T. 3456, supra, at 204.) This holding, which merely concerns conditions for approval by the Commissioner, cannot be interpreted to mean that an application to commence LIFO with one year automatically compels its commencement in the next succeeding year if the first year selected for some reason is not eligible for such selection. Clearly, in the instance referred to in I.T. 3456, the taxpayer would not be obliged to accept the conditions specified for the Commissioner's approval, and could continue with the FIFO method.

Plaintiffs contend, however, that these revocations are a nullity because there was never any formal notification that they were approved by the Commissioner of Internal Revenue. The filing of a statement of election (Form 970) results, plaintiffs argue, in irrevocable elections to use LIFO for all subsequent years and can thereafter be withdrawn, or such use of LIFO abandoned, only with the express consent of the Commissioner, which, they say, was never given. They point out that under Section 22(d) (5) of the 1939 Code, as well as the pertinent regulations issued thereunder (Reg. 103, Sec. 19.22(d)–5; C.F.R. 1940 Supp., Vol. 2, p. 1881), and the Form 970, elections to use LIFO are irrevocable unless permission to change is granted by the Commissioner.[7]

It is clear that plaintiffs misread these provisions in construing them to provide that a mere filing of a Form 970 automatically, and even prior to any approval of the application by the Commissioner, prevents the withdrawal thereof and compels the use of LIFO thereafter. The correct interpretation of all the provisions relied on, read in proper and full context, rejects such an illogical result. No reason is apparent why a taxpayer should not be privileged to withdraw a refund claim or an application to use LIFO prior to the Commissioner's taking any action thereon, and it is plain that that was exactly what plaintiffs then wished to do and felt they could do.

The obvious meaning of the Code and regulation provisions upon which plaintiffs rely is that when LIFO is used both in the elector's annual report and tax return for the base year specified in the election statement and the Commissioner approves the election, then the use of LIFO is required for all subsequent years unless, of course, the Commissioner thereafter approves a change therefrom. Naturally, once an accounting method is, with the approval of the Commissioner, adopted, its use must be continued if income is not to be distorted from year to year.

■ The provision in the above-mentioned Code section upon which plaintiffs rely to the effect that if LIFO is used for "any taxable year, then such method shall be used in all subsequent taxable years unless with the approval of the Commissioner a change to a different method is authorized," is prefaced with the condition "[i]f a taxpayer, having complied with paragraph (2) * * *." The "paragraph (2)" referred to is Section 22(d) (2), which, in subparagraph (B), provides that LIFO may be used "[o]nly if the taxpayer establishes to the satisfaction of the Commissioner" certain matters. Obviously therefore, approval by the Commissioner is presupposed. And the regulation relied on, in referring to the "method once adopted" being "irrevocable" and required to be used "in all subsequent taxable years, unless the use of another method is required by the Commissioner or authorized by him pur-

---

**7.** Such Code section provides:

"If a taxpayer, having complied with paragraph (2), uses the method described in paragraph (1) for any taxable year, then such method shall be used in all subsequent taxable years unless—

(A) With the approval of the Commissioner a change to a different method is authorized; * * * "

The regulation provides:

"*Revocation of election.*—An election made to adopt and use the elective inventory method is irrevocable, and the method once adopted shall be used in all subsequent taxable years, unless the use of another method be required by the Commissioner, or authorized by him pur-

suant to a written application therefor filed with him * * *."

Instruction 4 on Form 970 repeated the regulation provision in substantially verbatim form.

The pertinent regulations have sometimes been referred to herein by the parties as Regulations 111 issued under the 1939 Code. However, at the time plaintiffs filed their statements of election on March 31, 1943, the applicable regulations then in effect were Regulations 103, promulgated January 29, 1940. Regulations 111 were not promulgated until October 26, 1943. In any event, in all respects herein applicable they are substantially identical.

suant to a written, application therefor filed with him * * *" similarly presupposes an election that has been approved, for under the statutory scheme, the method cannot be deemed to have been effectively "adopted" without such approval. Furthermore, Section 19.22 (d)–2(g) of the same regulation specifically provides:

The elective inventory method [LIFO], once adopted by the taxpayer *with the approval of the Commissioner*, shall be adhered to in all subsequent taxable years * * * (Italics supplied),

with Section 19.22(d)–3 further providing:

*Whether or not the taxpayer's application for the adoption and use of the elective inventory method should be approved,* and whether or not such method, once adopted, may be continued, * * * will be determined by the Commissioner in connection with the examination of the taxpayer's returns. (Italics supplied.)

Plainly, the only rational construction of all these provisions is that an election application must be approved to become effective, and that, therefore, an unapproved application does not constitute an irrevocable election. It may, therefore, be withdrawn. Cf. National Lead Company v. Commissioner, 336 F.2d 134 (2d Cir. 1964), cert. denied, 380 U.S. 908, 85 S.Ct. 889, 13 L.Ed.2d 795 (1965).

■ Plaintiffs argue that they did not intend, by their withdrawal letters, to effect "unilateral" withdrawals, which, they contend, they were powerless to effect, but that instead they were merely seeking permission to withdraw. This is indicated, they say, by their statements that they merely "desire[d] to withdraw" the applications. They then felt, they say, that until their requests received the express approval of the Commissioner, they were still bound by their elections.

The record fails to support these contentions. Instead, it makes plain that when plaintiffs said they "desire[d]" to withdraw their refund claims and LIFO applications, they intended to give notice of a decision they had made and already effectuated, and that there was, therefore, no election request remaining outstanding upon which the Commissioner could act. As set forth above, the decision to abandon LIFO and revert to FIFO, and to withdraw the 1942 refund claims, was made at a meeting of the Board of Directors of Gimbels held on April 20, 1943, only three weeks after the Forms 970 had been filed. Gimbels' Annual Report to stockholders, issued April 24, 1943, just prior to plaintiffs' withdrawal letters, stated flatly: "It has been determined * * * to abandon the 'last-in first-out' method of inventories and to return to the method formerly in use * * *." There is no indication here that plaintiffs had decided merely to seek permission to abandon LIFO and that pending such permission they felt they would be obliged to continue with LIFO. Furthermore, as such Annual Report further shows, the figures for fiscal 1942, the only year to which LIFO had been applied and the proposed "first year" in plaintiffs' applications, were adjusted to a FIFO basis. And thereafter, for all the years herein involved, plaintiffs' books, annual reports, and tax returns were all kept, issued, and filed on the basis of FIFO. As the court pointedly observed in *Kaufmann and Baer,* supra:

* * * Notwithstanding the fact that plaintiff now contends that it was bound by its election to use LIFO, it consistently filed its tax returns on the FIFO basis and reverted to the FIFO basis in its reports to its stockholders. (133 Ct.Cl. at 518, 137 F.Supp. 725, at 730.)

On the basis of the whole record herein, the conclusion is again compelled that " * * * it is obvious that plaintiff intended to withdraw both its election and claim for refund and this was so understood by the Commissioner." (Kaufmann

and Baer, supra, 133 Ct.Cl. at 516, 137 F. Supp., at 729)[8]

Thus, as a result of valid and effective withdrawals, there were no outstanding statements of LIFO election applicable to fiscal 1943, the "first year" here relied on, or to any of the other years herein involved. Plaintiffs cannot, therefore, succeed in recovering on a LIFO basis for any of such years.

3. Finally, plaintiffs are in any event ineligible to qualify for LIFO for any of the tax years here involved because their annual reports for such years valued their inventories on the basis of FIFO. Section 22(d) of the Code specifically provides that a taxpayer may not use LIFO with respect to any taxable year if it used any other method in any of certain designated types of reports or statements, including reports to shareholders covering such year.[9] Obviously, a taxpayer should not be permitted to report higher profits to its shareholders than it reports to the Government for tax purposes.

Plaintiffs urge, however, that they should be regarded as in effect having been on a LIFO basis during the years in

---

8. Nor could plaintiffs have possibly thought that the Commissioner had any interest in imposing LIFO on them since he was then maintaining (erroneously, to be sure, as subsequently held in *Hutzler*, supra) that retailers such as plaintiffs were not entitled to use LIFO. That plaintiffs capitulated to such position instead of contesting it, as did *Hutzler*, does not improve their situation. As the court stated in Kaufmann and Baer, supra, at 518, 137 F.Supp., at 730: "The Commissioner's failure to act on the election to use LIFO did not prejudice plaintiff. It could have sought action by the Commissioner or from the courts if it desired. Instead of pursuing its legal remedies plaintiff sought to withdraw its claim for refund and its election."

9. The pertinent portions of Section 22(d) read as follows:

"(1) A taxpayer may use the following method (whether or not such method has been prescribed under subsection (c)) in inventorying goods specified in the application required under paragraph (2):

(A) Inventory them at cost;

(B) Treat those remaining on hand at the close of the taxable year as being: First, those included in the opening inventory of the taxable year (in the order of acquisition) to the extent thereof, and second, those acquired in the taxable year; and

(C) Treat those included in the opening inventory of the taxable year in which such method is first used as having been acquired at the same time and determine their cost by the average cost method.

(2) The method described in paragraph (1) may be used—

(A) Only in inventorying goods (required under subsection (c) to be in-

ventoried) specified in an application to use such method filed at such time and in such manner as the Commissioner may prescribe; and

(B) Only if the taxpayer establishes to the satisfaction of the Commissioner that the taxpayer has used no procedure other than that specified in subparagraphs (B) and (C) of paragraph (1) in inventorying such goods to ascertain the income, profit, or loss of the first taxable year for which the method described in paragraph (1) is to be used, for the purpose of a report or statement covering such taxable year (i) to shareholders, partners, or other proprietors, or to beneficiaries, or (ii) for credit purposes. * * *

(5) If a taxpayer, having complied with paragraph (2), uses the method described in paragraph (1) for any taxable year, then such method shall be used in all subsequent taxable years unless—

(A) With the approval of the Commissioner a change to a different method is authorized; or

(B) The Commissioner determines that the taxpayer has used for any such subsequent taxable year some procedure other than that specified in subparagraph (B) or paragraph (1) in inventorying the goods specified in the application to ascertain the income, profit, or loss of such subsequent taxable year for the purpose of a report or statement covering such taxable year (i) to shareholders, partners, or other proprietors, or beneficiaries, or (ii) for credit purposes; and requires a change to a method different from that prescribed in paragraph (1) beginning with such subsequent taxable year or any taxable year thereafter. * * * *"

question because, commencing with fiscal 1943, they established a reserve which, they say, was intended to approximate the results which would have been obtained had they actually used LIFO to value their inventories.

This contention cannot be accepted. The "reserve" in question was, as set forth in the fiscal 1943 report, labeled "reserve for post-war contingencies." For the other years here involved, it was termed as a "reserve for war and post-war contingencies." Although, because it was established in 1943 coincident with plaintiffs' decision to abandon LIFO and revert to FIFO, it may fairly be concluded that such reserve was intended to have some relationship to a protection against a postwar inventory deflation, it does not, nevertheless, appear that this "reserve" specifically related solely to inventories or that it was intended in effect to constitute a LIFO valuation technique. The reserve was in the round figure of $500,000, and was applied to the restatement of the 1942 figures. No addition at all was made to the reserve with respect to the 1943 financial statements, although it was then known that LIFO profits were $114,000 less for such year than profits calculated on the basis of FIFO. Three $1,000,000 additions were thereafter made to the reserve in fiscal 1944, 1945, and 1946. There are no calculations showing that any of these reserve amounts resulted from any effort to approximate the results of a LIFO inventory valuation calculation on any recognized or accepted basis, such as, as plaintiffs contend, the use of price indices. Instead, as plaintiffs' own 1948 Annual Report setting forth the LIFO and FIFO figures for such years shows

(finding 29(c)), a LIFO calculation would not approximate these results. While it is possible to use an appropriate "inventory reserve" in a proper amount as one method of achieving LIFO results, i. e., removing inflation from inventory values (Rev. Ruling 60–244, 1960–2 Cum. Bull. 167), the general reserve here relied on, vaguely labeled "for war and post-war contingencies", made up of round, lump-sum figures, and not specifically related to the inventory valuations which appeared on the "Assets" side of the financial statements but instead separately appearing on the "Liabilities" side, cannot be accepted, as plaintiffs argue, as constituting merely a substitute method of applying LIFO.[10] Similarly, on the profit and loss statement the reserve was applied after the calculation of "Net Profit" to which the inventory valuation, reflected in the "cost of goods sold" item, contributed. But, plainly, the LIFO method of valuation, whether or not used with a reserve, will in itself enter into the calculation of such profit figure in the first place. Cf. John Wanamaker Philadelphia, Inc. v. United States, supra, where the retailer taxpayer there involved had a specific inventory reserve that was carried in the inventory account itself.

What plaintiffs themselves contemporaneously said in their annual reports about their inventories clearly refutes their present contentions. As noted, in Gimbels' 1942 report, it was stated that thenceforth, and commencing with such report, LIFO would be employed. However, the 1943 report clearly stated: "It has been determined * * * to abandon the 'last-in first-out' method of inventories and to return to the method formerly in use, and to adjust the figures

10. In the case under consideration in Rev. Ruling 60–244, involving cut timber, the taxpayer inventoried the timber at fair market value (by itself impermissible under LIFO) but then, by an "inventory reserve," brought the value down to the cost basis (a LIFO requirement). The Ruling specifically pointed out that the "reserve" in question "is shown on the balance sheet as a deduction from inventories, but is not an allowable deduc-

tion for Federal income tax purposes." Because the Commissioner concluded "the net effect of such treatment is to reflect, in the inventory of the timber cut * * * on the financial statements and credit reports, the adjusted cost basis of such timber," he considered that such treatment of the inventory was consistent with the LIFO provisions of the Code.

for the year ended January 31, 1942 accordingly." Nothing was said to the effect that the purpose of the establishment of the reserve in connection with the restatement of the 1942 figures on a FIFO basis (for comparison with 1943, also calculated on FIFO) was to approximate LIFO. Nothing was added to the reserve for 1943, although a LIFO approximation would have called therefor. And all of the annual reports thereafter similarly stated that FIFO had been employed for the inventory valuations (i. e., described as "cost or market, whichever is lower, as determined by the retail inventory method") with the "net profit" figures set forth therein computed on such FIFO basis. It was not until 1948, after the *Hutzler* decision and the Treasury Department's acquiescence in it, that plaintiffs reversed their position. But even then they recognized that they had not been on LIFO during the previous years herein involved and that this was the serious obstacle they were facing.

The Gimbels Annual Report for said year specifically referred to plaintiffs "having abandoned" LIFO after 1942, to the 1942–1947 figures now being "restated to the LIFO basis", and to FIFO as the method "formerly in use".[11]

In H. C. Godman Company v. Busey, 51 A.F.T.R. 1482 (S.D.Ohio 1956), the court similarly rejected a taxpayer's effort in 1948 to prove a consistent use of LIFO for prior years by the use of a contingency reserve deduction from income, reliance instead being placed on the contemporaneous reports themselves which made plain that the inventories had been calculated on the basis of the lower of cost or market (contrary to the requirement that LIFO be used only on the basis of cost).

In summary, it is concluded that (1) no statement of LIFO election was, as required, filed for fiscal 1943, the "first year" here relied upon, or for any of the other years here involved, and that the untimely filed statement designating

11. As the report stated:

"Recently the Treasury Department acquiesced in a court decision making the last-in first-out (LIFO) inventory method available to retailers. Regulations issued for its use, however, limited this right to taxpayers who had filed tax returns on the LIFO basis and had issued reports to stockholders continually on that basis. The LIFO method was adopted by the Company in its report for the year ended January 31, 1942, but was abandoned for subsequent years because the Bureau of Internal Revenue had concluded that the use of the LIFO basis was not available to taxpayers whose inventory records were kept on the basis of retail inventory method. Thus the new regulations still leave at a disadvantage many retail companies including your Company. Accordingly, representations have been made by your Company and a number of other companies to have the Treasury Department extend the right to use the LIFO basis of inventory for tax purposes commencing with the year January 31, 1942, when it was first adopted.

Ordinarily the books of your Company would not be adjusted until approval of the LIFO basis by the taxing authorities, but in view of the requirement of the law that reports to stockholders be prepared on the LIFO basis in order to qualify for use of LIFO, the income and the taxes for the years ended January 31, 1942 to 1947, have been restated to the LIFO basis and the income for the year ended January 31, 1948, has been determined accordingly.

\* \* \* \* \*

For the year ended January 31, 1948, net profits of the Company on the basis of the inventory method formerly in use would have been $8,691,504., equal after preferred dividends to $4.06 a share on the 1,954,600 shares of common stock outstanding at the end of the year. However, on the basis of the LIFO adjustment as presented in the report submitted herewith, earnings for the fiscal year ended January 31, 1948, are reported at $6,221,912., equivalent after preferred dividends to $2.80 per share on the common stock.

The following figures summarize the sales and profits of the Company and its subsidiaries over the past seven years on the former basis and as revised to give effect to the LIFO basis:

\* \* \* \* \*

Comparative figures on value of inventories on the LIFO basis and the method formerly used are as follows: \* \* \* "

1942 as such base year does not qualify as a fulfillment of such requirement; (2) in any event, the 1942 statements of election were effectively withdrawn; and (3) during the years herein involved, plaintiffs' inventories were not, as required, evaluated on a LIFO basis in their annual reports to shareholders.

Plaintiffs' contentions concerning discrimination are without merit. Despite the provisions of the Code as they existed prior to the Revenue Act of 1942 making taxpayers ineligible to use LIFO if they had issued any interim financial report to stockholders (among others) on a basis other than LIFO, it appears that some retailers ineligible for such reason filed statements of election Form 970 anyway during such period in the confident expectation that the law would be amended so as to eliminate such obstacle to the use of LIFO. Their expectations were fulfilled. The Revenue Act of 1942 removed the prohibition provided the taxpayer's annual report was prepared on the LIFO basis, which change was made retroactive to tax years beginning after December 31, 1938, and the Commissioner thereafter apparently accepted their Forms 970. Because the taxpayers were not eligible for LIFO when they filed their Forms 970, but only became so later, plaintiffs complain about the acceptance of such taxpayers' "premature" elections, but not plaintiffs' elections, which they contend, although late for 1942, should at least be regarded as constituting prematurely filed elections for 1943 (despite the fact 1943 was nowhere mentioned in the election). Obviously, the two situations are entirely different, one constituting a retroactive statutory removal of a previous bar so as to validate an otherwise timely filed and valid election, the other consisting of an election untimely filed and never thereafter validated by amendatory legislation or otherwise (and, as shown, subsequently withdrawn anyway).

Nor is there any discrimination against plaintiffs because other retailers (like Hutzler) with timely filed Forms 970, who otherwise qualified for LIFO, but who had used, in their attempt to eliminate inflation from their inventories, certain price level indices (i. e., those computed by the National Industrial Conference Board) to measure the amount of such inflation in their LIFO computations, were nevertheless later permitted to amend their forms so as to use instead the indices that the Commissioner, after the *Hutzler* decision, ultimately approved for such use (i. e., those prepared by the Bureau of Labor Statistics). Where it was plain that the taxpayer had in fact used LIFO, permission to adjust the LIFO figures by the use of different price level indices is an entirely different matter from permitting taxpayers who had not used LIFO at all suddenly to adopt its use on a retroactive basis covering many prior years, it having become plain that it would have been advantageous to have been on such method all along.

For all the above reasons, the petitions herein, insofar as they assert claims based on the right to use the LIFO method of inventory valuations during plaintiffs' fiscal years 1943–1946, should be dismissed.[12]

12. This is the principal issue involved in the case. With the consent of the commissioner, there is a severance of the issues, there being reserved for later submission, if necessary, questions arising under the involuntary conversion features of the 1939 Code.